WILL OF MATTES: MATTES (Meta), Proponent and Appellant, vs. MATTES (Arthur), Contestant and Respondent.*

*December 8, 1954—January 11, 1955.*

* Motion for rehearing denied, with $25 costs, on March 8, 1955.

For the appellant there was a brief by *Strehlow & Cranston* of Green Bay, and oral argument by *Max H. Strehlow*.

For the respondent there was a brief by *Irving A. Puchner* of Milwaukee, attorney, and *J. Robert Kaftan* of Green Bay of counsel, and oral argument by *Mr. Kaftan*.

GEHL, J.   The applicable statute is sec. 238.11, which provides as follows:

"238.11 PROVISION FOR CHILD OMITTED BY MISTAKE, ETC. When any testator shall omit to provide in his will for any of his children or for the issue of any deceased child, and it shall appear that such omission was not intentional but was made by mistake or accident, such child or the issue of such child shall have the same share in the estate of the testator as if he had died intestate, to be assigned as provided in section 238.10."

It is contended that to sustain the claim of the contestant would be to ignore the rule that a person has unquestioned power to disinherit his children without cause. We are not dealing with a will; we are concerned with a statute. The statute was not designed to diminish or annul the right of one to dispose of his property by will; it does not attempt to regulate or control the testamentary disposition of property. Its purpose is to protect the interest of a child who by

his parent's failure through accident or inadvertence has not been provided for. The will still stands but the pretermitted child takes as if the testator had left no will. The right of a pretermitted child to take under the statute does not affect the will; it operates only to reduce the amount of testator's testate property. *Detroit Trust Co. v. Stoepel,* 312 Mich. 172, 20 N. W. (2d) 148.

"Children so situated [omitted] do not set up title under the will but under the statute. The will is used to establish that they have no legacy or devise under it. Then the inquiry arises whether the testator intended to omit them." *Coulam v. Doull,* 133 U. S. 216, 231, 10 Sup. Ct. 253, 33 L. Ed. 596.

"The purpose of the statute before us seems plain. It was passed to guard against the inadvertent and unintentional omission of children and their issue from the will of the parent or grandparent. Under it, a pretermitted child does not seek to defeat or amend the will itself. He does not seek to impeach it in any way. He seeks to have established a right unaffected by it. He does not seek a right under the will at all, but a right under the statute." *In re Dugan's Estate,* 108 Vt. 430, 433, 188 Atl. 887.

The underlying question in determining the matter here involved is whether the testator's omission to provide for his son was intentional or accidental. Anno. 170 A. L. R. 1317, 1319. The issue presented is one of fact, *Moon v. Estate of Evans,* 69 Wis. 667, 35 N. W. 20; *Will of Kurth,* 241 Wis. 426, 6 N. W. (2d) 233, and may be considered upon extrinsic evidence. *Newman v. Waterman,* 63 Wis. 612, 23 N. W. 696. That the burden of proof to establish an accidental omission is on the contestant in this case is clear from the language of the statute. The trial court determined that he had met that burden. We may not set aside the findings of ultimate fact, those upon which the son's right to recover necessarily depend, unless they are found to be

contrary to the great weight and clear preponderance of the evidence. *Swazee v. Lee,* 259 Wis. 136, 47 N. W. (2d) 733. .. .We have set forth the so-called findings at length because they are really a statement of the essential evidentiary facts which the court considered as supporting the ultimate finding; it so appears from a memorandum opinion filed by the judge. There is testimony which supports each of these so-called findings. We number the succeeding paragraphs to correspond with those of the so-called findings.

2. Although it does not appear that testator drew the will in a thoughtless manner, the scrivener's testimony indicates that there was no lengthy conversation between them before execution of the will. The scrivener testified that he did not learn of the existence of the son until some considerable time after execution of the will.

3. The facts there recited are undisputed.

4. The statement as to the value of testator's estate and of the property held jointly by him and his wife is correct.

5. There is abundant testimony that the relationship between the testator and his son was very close at all times. In fact, no effort was made to contradict the testimony of the son and several other disinterested witnesses to that effect.

6. The testimony permits of the inference that testator thought that he had provided for his son. Norbert Brick who had been employed by decedent since 1936 testified that in 1951 he had indicated to testator that he might be interested in buying the latter's hardware business; that testator told him that he would give him a chance to buy it; that, when the witness spoke of acquiring the money needed, testator said that he would see that the witness would get a good start and that if something should happen to him, the son Arthur would be there and that the witness would be dealing with him. He testified further that shortly before testator went to a hospital and shortly before his death the same matter was discussed and again the testator said that if the

witness owed anything at the time of his death the son would take care of it.

A neighbor for many years, Peter J. Petrie, testified that on one occasion he and the testator had some conversation with respect to wills. The witness told him that he had made his; the deceased answered that Artie, the son, would have nothing to worry about; when he passed on Artie would be well taken care of.

John Miron, an internal-revenue agent who investigated testator's income-tax returns, testified that on July 9, 1952, in a conversation he had with deceased respecting his income-tax returns, the latter told him that he wanted to have a clear slate for Artie when the latter took his place; that he did not know whether the son would be interested in the father's business, but whether he would be interested or not it was going to be his to do as he pleased with; that his only concern was for his son and his granddaughters. These declarations of the testator were properly received in evidence, 57 Am. Jur., Wills, p. 412, sec. 600.

7. There was no dispute as to the son's income and his financial condition.

8. Although it is disputed, there is testimony that the stepmother's attitude toward the son was not friendly. He testified that there was ill-feeling between them during all the time that he lived at his father's home, that it was impossible for him "to do anything right;" that on a number of occasions she called him a "G— d— Luloff," the latter being his mother's maiden name; that on another occasion she threw a butcher knife at him.

9. It is not disputed that after executing his will in 1944 testator placed securities of the value of approximately $50,000 in the joint names of himself and his wife.

10. In paragraph numbered 6 we have discussed in more detail the statements to which the trial judge refers.

All of these facts and circumstances to which the trial judge refers were properly considered in determining the ultimate issue.

"Evidence of the circumstances under which the will was executed, the intelligence of the testator, the size of the estate, the relations between the testator and the omitted children at the time of the execution of the will, and declarations of the testator have been held to be not only admissible on the issue whether the failure of the testator to provide for a child or the issue of a deceased child was intentional, irrespective of whether offered by a party seeking to show that the omission was unintentional or by a party seeking to establish that it was intentional; but to be sufficient to establish the intent of the testator in this respect." 57 Am. Jur., Wills, p. 411, sec. 599.

We consider it most significant that after execution of the will the testator placed in the joint names of himself and his wife securities worth about $45,000. If he supposed that he had provided by his will that she should have his entire estate, why these transactions? If he made the change to decrease the amount of state inheritance tax to be paid or to reduce the expense of administration of his estate, why did he not place all of his property in the joint names?

Equally significant are the declarations made by him. They indicate most clearly that the deceased was under the impression that he had made provision for his son.

The trial judge's findings must be sustained and the judgment affirmed.

*By the Court.*—Judgment affirmed.

CURRIE, J., concurs in the result.